## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MDB, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) 2:18-cv-01079 |
| v. | ) |
| | ) |
| PUNXSUTAWNEY CHRISTIAN | ) |
| SCHOOL, et al., | ) |
| | ) |
| Defendants. | ) |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

Minor-Plaintiff MDB was sexually assaulted by another minor student while riding in a Purchase Line School District-provided van to Punxsutawney Christian School. Plaintiff Michael Bridge, MDB's father, concerned and alarmed by the incident, reported it to Punxsutawney, Purchase Line, and Tri-County Transportation, Inc. (the van operator). He also began to transport MDB to and from school himself. When Punxsutawney, Purchase Line, and Tri-County did not enact the remedial measures he requested, he eventually withdrew MDB from Punxsutawney and enrolled him in another private school for the next school year. Plaintiffs allege that by forcing MDB to choose between attending and accessing transportation to school and thereby encountering his alleged abuser, and attending a different school, Defendants violated federal and state law. For the reasons that follow, the Court concludes that Defendants' respective Motions to Dismiss will be granted in part and denied in part.

## I. BACKGROUND

### A. Facts[1]

Minor-Plaintiff MDB's home School District is Defendant Purchase Line School District ("Purchase Line" or the "District"). (First Amended Complaint ("FAC" or "Complaint"), ECF No. 15, ¶ 17.) During the 2015–2016 school year, he attended Defendant Punxsutawney Christian School ("Punxsutawney"). (*Id.* ¶ 17.) He was transported to and from school in a van owned and operated by Defendant Tri-County Transportation, Inc. ("Tri County"). (*Id.* ¶ 21.) Purchase Line provided this transportation under the Pennsylvania statute that provides that if a School District provides transportation for public school students, it must also provide transportation for non-public school students, as long as the school is a nonprofit and is not more than ten (10) miles outside of the district's boundaries. 24 Pa. Stat. Ann. § 13-1361.

In or around May of 2016, another student, KR, sexually assaulted MDB in the van. (FAC ¶ 22.) MDB reported that KR told him he could use KR's smart device if MDB touched KR. (*Id.* ¶ 23.) KR then "bopped" MDB in the penis and exposed himself to MDB. (*Id.* ¶ 23.) Two years before this incident, KR brought a knife to school and threatened MDB. (*Id.* ¶ 24.)

On or about May 11, 2016, MDB reported the assault to his parent, Plaintiff Michael J. Bridge. (*Id.* ¶ 26.) On the same day, Bridge reported the assault to Purchase Line and Punxsutawney. (*Id.* ¶ 27.) The next day, May 12, 2016, Bridge met with Lori Galbraith, Punxsutawney's School Administrator, at Punxsutawney to discuss the incident. (*Id.* ¶ 28; Punxsutawney Christian School Student Handbook, ECF No. 18–2, at 8.) Galbraith asked Bridge if he wanted her to report the assault to the Pennsylvania ChildLine and Abuse Registry ("ChildLine"). (FAC ¶ 28.) Bridge advised that he did want it to be reported. (*Id.*) However, Bridge later became aware that Galbraith had not reported the incident to ChildLine on that day.

---

[1] The Court draws the facts from Plaintiffs' First Amended Complaint, ECF No. 15.

(*Id.*)

Punxsutawney did not discipline KR, and KR continued to ride the Tri-County van to and from school (*Id.* ¶¶ 30–31.) Bridge decided to transport MDB to and from school himself. (*Id.* ¶ 32.) On May 16, 2016, at a meeting with Bridge and MDB, Galbraith spoke with MDB directly, and reported the incident to ChildLine. (*Id.* ¶ 33.)

Bridge then set up an appointment with Purchase Line's Superintendent, Joseph Bradley. (*Id.* ¶ 34.) Bridge explained the incident to Bradley, who responded, "What do you want Purchase Line to do?" (*Id.* ¶ 34.) Plaintiff does not allege that he responded with suggested actions, but in any event, Bradley did not take any further action to report the assault. (*Id.*)

On May 20, 2016, Bridge notified Tri-County of the assault. (*Id.* ¶ 35.) Tri-County responded that it does what Purchase Line tells it to do and had no ability to take any independent action. (*Id.* ¶ 35.)

In July of 2016, Bridge became aware that none of the Defendants had reported the assault to police. (*Id.* ¶ 36.) He then notified the police in order to make a report. (*Id.*) Ultimately, KR was criminally charged with indecent assault and indecent exposure. (*Id.*) During the police investigation, Bridge attended school board meetings and had phone calls with administrators to discuss his safety concerns for MDB. (*Id.* ¶ 37.) Bridge continued to drive MDB to and from Punxsutawney for the remainder of the 2015–2016 school year. (*Id.* ¶ 38.)

During the rest of the 2015–2016 school year, MDB continued to "encounter" KR at school. (*Id.* ¶ 39.) Punxsutawney did not provide additional supervision to KR and MDB or "ensure that [MDB] would not come in contact with KR." (*Id.* ¶¶ 39, 42) MDB suffered "intimidation, harassment, emotional distress, and physical manifestations of psychological anguish" as a result of these encounters. (*Id.* ¶ 40.) Before the end of the school year, Bridge,

3

who was still driving MDB himself, informed Purchase Line and Punxsutawney that he wanted an aide to be placed on the van to supervise MDB. (*Id.* ¶ 44.) On August 16, 2016, Purchase Line informed Bridge that the District would facilitate placing an aide on the bus if Punxsutawney paid for the aide. (*Id.* ¶ 45.) For its part, Punxsutawney informed Bridge that it did not have the funds in its budget to pay for the aide. (*Id.*) Punxsutawney offered to have MDB and KR sit apart from each other, with one sitting in the front of the van and the other sitting in the back. (*Id.* ¶ 46.) Punxsutawney told Bridge that if this was unacceptable, he could explore other educational options for MDB. (*Id.*) Punxsutawney also wrote a letter to Bridge saying that, beginning in the 2016–2017 school year, it did not want further discussion of the matter with the Punxsutawney administration or staff. (*Id.* ¶ 47.)

Bridge did not find Punxsutawney's proposed accommodation acceptable, and chose to withdraw MDB from the school and enroll him in Northern Cambria Catholic School ("Northern Cambria Catholic") for the 2016–2017 school year. (*Id.* ¶ 49.) Northern Cambria is outside of the ten-mile radius for which Purchase Line is required to provide transportation. (*Id.* ¶ 50.) Thus, Bridge had to find transportation himself for MDB to attend Northern Cambria Catholic. (*Id.*)

Bridge filed a complaint with the Office of Civil Rights ("OCR"), of the federal Department of Education, alleging that Defendants violated MDB's rights under Title IX. (*Id.* ¶ 51.) OCR began to investigate Purchase Line. (*Id.* ¶ 53.) On July 26, 2018, OCR issued a final resolution of Bridge's complaint. (*Id.* ¶ 54.) OCR concluded that Purchase Line did not provide a prompt and equitable response to the report that MDB was sexually harassed, that Purchase Line's Title IX grievance procedures are not widely published, and that the Title IX Coordinator was not adequately trained in the District's procedures and how to respond to the report of sexual harassment, including maintaining adequate records of the District's response. (*Id.* ¶ 55.)

4

Purchase Line entered into a resolution agreement to remedy these violations. (*Id.* ¶ 56.)

## B. Procedural History

Plaintiffs MDB and Bridge initiated this lawsuit in the Court of Common Pleas in Indiana County. (ECF No. 1.) Defendants removed it on August 16, 2018. (*Id.*) Plaintiffs filed a First Amended Complaint on September 12, 2018. (ECF No. 15.) Punxsutawney, Tri-County, and Purchase Line each filed a Motion to Dismiss for Failure to State a Claim. (ECF Nos. 17, 19 & 21.) Plaintiffs filed Responses. (ECF Nos. 25, 26 & 27.)

The Court has reviewed the Motions, Responses, and all briefing in support therein, and the matter is ripe for disposition.[2]

## II. LEGAL STANDARD

Federal courts must dismiss cases that fail to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Complaints therefore must allege facts "sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). When determining whether dismissal is appropriate, the Court must: "(1) identify[] the elements of the claim, (2) review[] the complaint to strike conclusory allegations, and then (3) look[] at the well-pleaded components of the complaint and evaluat[e] whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). The Court "accept[s] all factual allegations as true, construe[s] the complaint in the light most favorable to the plaintiff, and determine[s] whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Blanyar v. Genova Prods. Inc.*, 861 F.3d 426,

---

[2] The Court will exercise its discretion under Federal Rule of Civil Procedure 78(b) and decide the pending motion to dismiss on the briefs and without oral argument. *See generally Fabics v. City of New Brunswick*, 629 F. App'x 196, 199 n.5 (3d Cir. Oct. 19, 2015) ("[A] district court has broad discretion to decide a motion with or without oral argument.").

431 (3d Cir. 2017) (citation omitted). The Court may consider "only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents." *Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261, 268 (3d Cir. 2016) (quoting *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)).

## III. DISCUSSION

Plaintiffs' Complaint asserts ten (10) Counts. Count I alleges a Title IX violation against Purchase Line.[3] Count II alleges a Title IX violation against Punxsutawney. Count III alleges a violation of 42 U.S.C. § 1983 for injury to bodily integrity as a result of state-created harm, against Purchase Line. Count IV alleges a violation of 42 U.S.C. § 1983 for injury to bodily integrity as a result of state-created harm, against Punxsutawney. Count V alleges a *Monell* claim against Purchase Line. Count VI alleges a *Monell* claim against Punxsutawney. Count VII alleges a claim for negligent infliction of emotional distress against Punxsutawney and Tri-County. Count VIII alleges a negligence claim against Punxsutawney. Count IX alleges a negligence claim against Tri-County. And Count X alleges a breach-of-contract claim against Punxsutawney.

The Court will address each set of claims against Purchase Line, Punxsutawney, and Tri-County, and the respective Motions to Dismiss, in turn.

### A. Title IX Claims

In Counts I and II, Plaintiffs MDB and Bridge allege claims against Purchase Line and

---

[3] Parents of a student whose rights were allegedly violated do not have standing to assert personal claims under Title IX, but do have standing to assert claims on the student's behalf. *Dipippa v. Union School Dist.*, 819 F. Supp. 2d 435, 446 (W.D. Pa. 2011). Here, Bridge brings his Title IX claims on MDB's behalf, but brings all other claims on behalf of himself and MDB. For ease of reference and consistency, the Court will refer to arguments in the Title IX section of this Opinion as advanced by "the Plaintiffs" with the understanding that the Title IX claims are brought only on MDB's behalf and not independently by Bridge.

6

Punxsutawney for violations of Title IX. Title IX provides, with certain exceptions, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "Although Title IX does not expressly permit private enforcement suits, the Supreme Court has found an implied private right of action for individuals to enforce Title IX through monetary damages actions." *Hill v. Cundiff*, 797 F.3d 948, 968 (11th Cir. 2015) (citing *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 76 (1992); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979)).

Claims of peer (student-to-student) harassment are actionable under Title IX. *See Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643, 646–47 (1999). To recover under Title IX based on peer harassment, "a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Id.* at 651. Moreover, "schools can only be liable for 'deliberate indifference to known acts of peer sexual harassment,'" meaning "that 'the [funding] recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.'" *Raihan v. George Washington Univ.*, 324 F. Supp. 3d 102, 108 (D.D.C. 2018) (quoting *Davis*, 526 U.S. at 648).

Accordingly, a plaintiff must prove five elements to recover under Title IX based on peer harassment: (1) that the defendant is a Title IX funding recipient; (2) that an "appropriate person," *i.e.* "an official with authority to take corrective action" had actual knowledge of the alleged harassment, *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274 (1998); (3) that the harassment was "severe, pervasive, and objectively offensive," *Davis*, 526 U.S. at 650; (4) that

7

the funding recipient acted with deliberate indifference, i.e., that its response or lack of response was "clearly unreasonable," *id.* at 648; and (5) that the harassment "effectively bar[red] the victim's access to an educational opportunity or benefit," *id.* at 633.

Concerning the "severe, pervasive, and objectively offensive" element, the Supreme Court explained in *Davis* that "[t]he most obvious example of student-on-student sexual harassment capable of triggering a damages claim would thus involve the overt, physical deprivation of access to school resources." *Davis*, 526 U.S. at 650. The Court provided the example of "a case in which male students physically threaten their female peers every day, successfully preventing the female students from using a particular school resource—[for instance,] an athletic field or a computer lab." *Id.* at 650–51.

However, physical exclusion is not necessary to demonstrate a student was deprived of an educational opportunity on the basis of her gender. *Id.* at 651. When physical exclusion is lacking, "courts consider whether the harassment 'had a concrete, negative effect' on the plaintiff's 'ability to receive an education.'" *Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 367 (S.D.N.Y. 2017) (quoting *Davis*, 526 U.S. at 654). Examples of such negative effects might include a substantial decline in grades or deterioration of a student's mental health. *See id.* at 634 (explaining that the plaintiff's high grades had dropped and she had written a suicide note); *Doe v. Erskine College*, No. 8:04–23001RBH, 2006 WL 1473853, at \*7, 13 (D.S.C. May 25, 2006) (finding sufficient evidence of deprivation of educational opportunities when college-aged plaintiff was "referred to on campus as the 'rape girl,'" suffered panic attacks each time she had to encounter her alleged rapist (who disobeyed a no-contact order), began taking anti-depressants and Valium, began to self-harm, attempted suicide, took a medical leave of absence, and lost scholarships due to a drop in grades).

The Supreme Court also considered whether a single incident of harassment could ever have such an effect, noting that:

Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment.

*Davis*, 526 U.S. at 652.

Additionally, the *Davis* Court noted that alleged peer harassment must have occurred in an environment over which the funding recipient exercised some degree of control. *See Davis*, 526 U.S. at 643–45 ("Deliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment. A recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action."). The Supreme Court instructed that courts are to consider the conduct of the *funding recipient*, not the alleged harasser, and hold the recipient liable only if its deliberate indifference "subjected" the plaintiff to discrimination. *Id.* at 640.

The Court will consider Plaintiffs' Title IX claims against Purchase Line and Punxsutawney under the *Davis* framework. The Court concludes that Plaintiffs have failed to state a Title IX claim for which relief can be granted against Punxsutawney, but that Plaintiffs' Title IX claim against Purchase Line can proceed.

### 1. Claim against Purchase Line

Purchase Line argues that Plaintiffs have failed to state a Title IX claim because they fail to adequately allege a hostile environment or deliberate indifference as required by the Supreme Court's ruling in *Davis*.[4] Plaintiffs argue that Purchase Line took no action to investigate or

---

[4] It is undisputed that Purchase Line is a funding recipient and thus subject to Title IX's requirements.

remedy the problem, and that MDB was subjected to a hostile environment because he would have had to continue to ride in the van with his abuser.

As a preliminary matter, the fact that OCR determined that Purchase Line did not comply with certain provisions of Title IX does not mean that Plaintiffs' private action against Purchase Line can proceed. The standard set forth in *Davis* for asserting a private claim under Title IX requires plaintiffs to plead more than a violation of one of Title IX's regulatory provisions.

The Court concludes that Plaintiffs have plausibly alleged that the peer harassment MDB experienced was "so severe, pervasive, and objectively offensive that it can be said to have" deprived him "of access to educational opportunities or benefits provided by the school," *Davis*, 526 U.S. at 650. A defendant moving to dismiss bears the burden of showing that no claim has been presented. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). Purchase Line has not satisfied this burden.

Plaintiffs allege that MDB was physically sexually assaulted by another student. Bridge kept MDB off the van after learning of the alleged assault, and then informed Purchase Line of the assault. Purchase Line's Superintendent asked Bridge what he wanted the District to do. (*See* FAC ¶ 34.) As alleged, Purchase Line did not take any further action, and later told Bridge that they would place an aide on the bus if Punxsutawney paid for the aide, and also told him that the District could not provide separate transportation for MDB. Bridge alleges that he "was forced to drive [MDB] to and from Punxsutawney" because Defendants had not offered "safety accommodations." (FAC ¶ 38.) He then withdrew MDB from Punxsutawney altogether and began to transport him to another private Christian school outside of Purchase Line's district boundary.

Purchase Line argues that because no allegations of assault occurred after the alleged

10

incident with KR in the van, the pleadings do not suffice to show a hostile educational environment. Repeated incidents are not required to plead a hostile environment, however, because a single incident can give rise to Title IX liability. *Davis*, 526 U.S. at 652. And a plaintiff need not demonstrate that she experienced actual harassment after reporting sexual misconduct. *See id.* at 644–45. However, the "severe, pervasive, and objectively offensive" standard requires that the harassment must "be said to deprive [the plaintiff] of access to the educational opportunities or benefits provided by the school." *Id.* at 650.

Although the Supreme Court noted in *Davis* that it was unlikely that Congress would have thought a single instance of peer harassment could rise to the level of denying a victim equal access to an educational program, *id.*, other Courts have found "sufficiently severe" harassment under Title IX based on a single incident of sexual assault or rape. *See, e.g.*, *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999) (concluding that the harassment, sexual molestation, and rape of female special education student by three of her classmates at school and on the bus satisfied the "severe, pervasive, and objectively offensive" prong); *Bliss v. Putnam Valley Cent. Sch. Dist.*, No. 06–15509, 2011 WL 1079944, at *1, 5 (S.D.N.Y. Mar. 24, 2011) (holding single incident where male social studies teacher drugged and raped female student "sufficiently severe" under Title IX); *M. v. Stamford Bd. of Educ.*, No. 05–0177, 2008 WL 2704704, at *9 (D. Conn. July 7, 2008) (finding single incident of rape by male student of a female special education "sufficiently severe" harassment under Title IX), *vacated in part on other grounds*, 2008 WL 4197047; *Kelly v. Yale Univ.*, No. 01–1591, 2003 WL 1563424, at *3 (D. Conn. Mar. 26, 2003) (holding single incident of rape by male student was "sufficiently severe").

The Court is not prepared to hold, at the pleadings stage, that a single incident of physical sexual assault involving sexual coercion and nonconsensual genital touching of a nine-year-old

11

boy cannot be sufficiently severe as to deprive him of the educational environment of riding to school in a publicly funded van. Purchase Line's argument that MDB "was not participating in a Purchase Line Program or activity at the time of the assault," (Purchase Line Br., ECF No. 22, at 8,) ignores Purchase Line's obligation under Pennsylvania law to provide MDB transportation. Also, Superintendent Bradley's alleged statement to Bridge that the District would provide an aide only if Punxsutawney paid for it does not insulate it from liability, because it is *Purchase Line*'s state law responsibility to provide safe transportation for its students.

Purchase Line's note that it publishes its Title IX grievance procedures, while relevant to Plaintiffs' pleadings, also does not shield it from Title IX liability under a deliberate indifference standard. As pleaded, Purchase Line did nothing when faced with an allegation of sexual assault on a school van. Purchase Line is correct that federal law did not require it to enact Bridge's proposed accommodations. But the District's complete *inaction*, as alleged, under the circumstances here and at the pleadings stage, is enough to support a claim that MDB was deprived of access to his educational environment.

Accordingly, Purchase Line's Motion to Dismiss Plaintiffs' claim against it in Count I will be denied.[5]

### 2. Claim against Punxsutawney

Punxsutawney first argues that it is not a recipient of federal funds under Title IX, and therefore Plaintiffs cannot assert a private right of action against it. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied

---

[5] The Court also does not condone Purchase Line's rhetoric to the effect that to show that the District's action or inaction was unreasonable, "Plaintiff must explain why he would allow seven (7) days to pass prior to informing Purchase Line" of the assault. (Purchase Line Br., ECF No. 22, at 8.) Even if Purchase Line is correct that Bridge was also a mandatory reporter, and that Punxsutawney had already called ChildLine by the time Bridge reported the assault to Purchase Line, that is beside the point when considering what *Purchase Line*'s federal legal obligations were. It is not Bridge's burden to explain his own response to his child's assault.

12

the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."). Plaintiffs aver that their allegations that Punxsutawney receives federal funding suffice at the pleading stage.

In support of its argument, Punxsutawney has requested that the Court take judicial notice of its Exhibit A, ECF No. 31–1, which contains a June 14, 2017, letter from OCR to a redacted recipient, and an email exchange between that individual and OCR officials inquiring about whether Punxsutawney receives federal funds. This letter appears to have been obtained through a FOIA request from OCR for any complaints filed against Punxsutawney in 2016 alleging Title IX violations, and any accompanying resolution letters. (Ex. A, ECF No. 31–1, at 1.) Under Federal Rule of Evidence 201, the Court may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. The Court may also consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

A public record is not simply one that is accessible to the public, but rather one to which "the public ha[s] unqualified access." *Id.* at 1197. Although Punxsutawney was able to access the letter through a FOIA request, the public lacks unqualified access to it, as evidenced by the need to obtain it through the FOIA and the document's redactions. Nor do Plaintiffs' claims in the Complaint rely on the document. The Court therefore will not take judicial notice of the OCR letter. Whether Punxsutawney actually receives federal funding, and therefore is a "funding

13

recipient" under Title IX is a factual issue not resolvable on a Motion to Dismiss.[6] Plaintiffs' allegations that Punxsutawney receives federal funding or grant money, (FAC ¶ 12) suffice at this stage.

Next, Punxsutawney argues that Plaintiffs have failed to make out a claim for violation of Title IX because its actions were not clearly unreasonable, and because there are no allegations of harassment following Bridge's removing MDB from the van. Plaintiffs counter that Punxsutawney's failure to address their concerns "resulted in [MDB] having no choice but to withdraw and enroll at another school." (Pls.' Reply to Punxsutawney, ECF No. 30, at 5.)

While KR's alleged conduct on the van was plainly sexual harassment, Punxsutawney had no actual knowledge of the harassment before it occurred. It therefore could not have acted with deliberate indifference regarding the assault itself.

As to what happened after the assault, Plaintiffs aver that KR was permitted to continue to attend school and ride in the van, a state of affairs that allegedly caused MDB stress and psychological harm. But, as noted above, Plaintiffs have not alleged that KR continued to harass MDB after the assault. Bridge removed MDB from the van. They allege that MDB "continued to encounter" KR in the remaining weeks in the school year. However, mere encounters do not amount to "severe, pervasive, and objectively offensive" conduct for Title IX purposes. *See Frazer v. Temple Univ.*, 25 F. Supp. 3d 598, 614 (E.D. Pa. 2014) (concluding that a university

---

[6] The Court will not take judicial notice of the OCR Letter for its truth. The Court will, however, note that the content of the letter illustrates that an individual alleging discrimination against his son by Punxsutawney following a sexual assault on a van on the way to the school was explicitly told, in June of 2017, that "[t]he School does not receive federal financial assistance from the Department, and OCR does not have other delegated authority over it. Consequently, OCR does not have jurisdiction to investigate complaints against the School, and we are dismissing your complaint against the School." (Ex. A, ECF No. 31–1, at 12.) The Court reminds the parties of their obligations under the Federal Rules of Civil Procedure, including that by presenting a pleading, an attorney certifies that its factual contentions have evidentiary support. Fed. R. Civ. P. 11(b)(3). If it were to turn out that Plaintiff was indeed the recipient of the letter from OCR, it would be reasonable to conclude that the pleading that Punxsutawney receives federal funding lacked evidentiary support, and in fact was known to be false at the time it was made, as the First Amended Complaint was filed on September 12, 2018. If that were to turn out to be what happened, then any lawyer signing and filing such a pleading would be in big trouble.

14

did not violate Title IX by permitting alleged sexual harasser to remain on campus during the investigation).

Plaintiffs also allege that Punxsutawney violated Title IX by failing to take disciplinary action against KR or "provide interim measures to [MDB] during its investigation," (Pls.' Reply to Punxsutawney, ECF No. 30, at 5.) But the law does not impose such a standard. Rather, "the [funding] recipient must merely respond to known peer harassment in a manner that is *not clearly unreasonable*." *Davis*, 526 U.S. at 649 (emphasis added). The Supreme Court cautions that Title IX "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.* at 648. Punxsutawney was under no duty to expel KR or take any other particular disciplinary action against him, including the actions Bridge demanded.

The Court concludes that Plaintiffs have not alleged facts from which a reasonable jury could determine that Punxsutawney's response to the incident on the van was clearly unreasonable. Plaintiffs have not averred that MDB experienced peer sexual harassment before the incident, and so Punxsutawney could not have had actual knowledge beforehand.[7] Plaintiffs allege that Bridge advised Punxsutawney of the alleged assault on May 12, 2016, and Galbraith spoke with MDB on May 16, 2016, and then reported the incident to ChildLine. Although Pennsylvania law required Galbraith, as a staff member of a private institution, to "report immediately," 23 Pa. Cons. Stat. Ann. § 6311(c), her delay in reporting did not, in and of itself, create a hostile educational environment for MDB. Punxsutawney's response may not have been what Bridge requested, but that does not mean that it was so clearly unreasonable as to have violated federal law. A four-day delay in reporting, whether it violates *state* law, does not

---

[7] Plaintiffs allege that KR brought a knife to school two years earlier and threatened MDB. (FAC ¶ 24.) This allegation does not suffice to establish a plausible inference that Punxsutawney had actual knowledge that, two years later, KR would sexually assault MDB.

15

constitute deliberate indifference under Title IX.

\*\*\*

In sum, Plaintiffs plausibly allege a Title IX claim against Purchase Line, but not against Punxsutawney.

## B. Section 1983 Claims

In Counts III and IV, Plaintiffs allege § 1983 claims against Purchase Line and Punxsutawney, respectively, under a theory of injury to bodily integrity as a result of state-created harm. In Counts V and VI, Plaintiffs allege § 1983 claims against Purchase Line and Punxsutawney, respectively, under a *Monell* failure-to-train theory.

Section 1983 creates liability to the injured party for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by persons acting under color of state law. 42 U.S.C. § 1983. The statute does not create substantive rights, but instead provides a remedy for rights established under other substantive provisions of law. *City of Oklahoma v. Tuttle*, 471 U.S. 808, 816 (1985). To state a § 1983 claim, the plaintiff must show that the defendant, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution and laws. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995).

Here, Plaintiffs advance two types of claims against Purchase Line and Punxsutawney: municipal liability claims,[8] and Fourteenth Amendment claims on the basis of a right to bodily integrity, under the state-created danger exception to the Due Process Clause. They have not alleged any claims against any individual actors.

---

[8] Because this set of Plaintiffs' claims are based on the theory of municipal liability recognized in *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1979), the Court will refer to them as "*Monell* claims"

#### 1. *Monell* claims

For a School District to be liable, "any injury must be inflicted by execution of [its] policy or custom." *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 (3d Cir. 2010) (internal quotation marks omitted). *Monell* requires that a municipality cannot be liable for the unconstitutional acts of its employees on a theory of *respondeat superior*, but rather the plaintiff must "demonstrate that the violation of his rights was caused by either a policy or a custom of the municipality," *Berg v. Cty. of Allegheny*, 219 F.3d 261, 275 (3d Cir. 2000); *see Sanford*, 456 F.3d at 313–14. "Policy is made when a 'decisionmaker possessing final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Id.* (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996)). Even a single decision made by a final policymaker—such as a superintendent—can "render his or her decision district policy." *McGreevy v. Stroup*, 413 F.3d 359, 368 (3d Cir. 2005).

"[I]n the absence of an unconstitutional policy, a municipality's failure to properly train its employees and officers can create an actionable violation of a party's constitutional rights under § 1983." *Reitz v. Cty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997). A government agency or entity's failure to adequately train its employees can establish a § 1983 claim only if the deficient training reflects a deliberate indifference to an individual's civil right that is "closely related to the ultimate injury." *City of Canton v. Harris*, 489 U.S. 378, 391 (1989). "In analyzing causation, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* at 390. Proving that the injury could have been avoided if the official had more or better training is not enough to establish municipal liability. *Id.* Otherwise, "[s]uch a claim could be made about almost any encounter resulting in injury." *Id.* Instead, a plaintiff must show that the training deficiency was the actual cause of the violation of her civil rights.

*Wolosyzn v. Cty. of Lawrence*, 396 F.3d 314, 325 (3d Cir. 2005).

"Establishing municipal liability on a failure to train claim under § 1983 is difficult." *Reitz*, 125 F.3d at 145. "Failure to train . . . municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations." *Berg v. Cty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (per curiam). While it is possible to maintain a failure-to-train claim without showing a pattern, the Supreme Court has stated that the burden on a plaintiff in such a case is high. *City of Canton* "did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Board of Cty. Com'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 409 (1997). This path is narrow, and a plaintiff must show that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390.

### a. Claim against Purchase Line

Plaintiffs base their *Monell* claim against Purchase Line on a failure to train or supervise theory. Purchase Line seeks dismissal of this claim on the grounds that Plaintiffs' averments do not make out a deliberate indifference to their rights, and because they have not alleged facts from which a reasonable jury could conclude that any alleged training deficiency actually caused a violation of their rights.

It appears Plaintiffs are pursuing their alleged *Monell* claim under a "pattern of violations" theory. (*See* FAC ¶¶ 129 & 130.) Purchase Line argues that Plaintiff cannot establish that the District took any action with deliberate indifference and that the alleged harm (Bridge's

18

removal of MDB from the van) is insufficiently linked to Purchase Line's alleged lack of training under Title IX. Plaintiffs, on the other hand, point to OCR's conclusion that Defendant's Title IX coordinator was inadequately trained in Title IX procedures and how to respond to reports of sexual harassment, including maintaining adequate records of Purchase Line's response.[9]

The Court concludes that although Plaintiffs have alleged facts supporting an inference that Purchase Line's training in Title IX was lacking, Plaintiffs have not plausibly shown that more or better training would have prevented the alleged injury—Bridge's removal of MDB from the van and eventually from Punxsutawney. (*See* Pls.' Reply to Purchase Line, ECF No. 29, at 11 ("[MDB] was victimized a second time, after being forced to leave his friends and school due to Defendant's failure to take appropriate action under Title IX.").) Plaintiffs argue that they were not offered any reasonable accommodations that would have permitted MDB to continue to ride in the van. But they judge reasonableness according to their own yardstick, not anything they contend that Title IX requires.

Even if the Title IX Coordinator were adequately trained in Title IX procedures and responding to reports, that does not mean he would have taken actions that Bridge found to be satisfactory. Indeed, he might have been perfectly trained and still have come to the same

---

[9] The Supreme Court in *Fitzgerald v. Barnstable School Committee* held that "Congress did not intend Title IX to preclude § 1983 constitutional suits. 555 U.S. 246, 256 (2009). *Fitzgerald* involved a kindergartener who claimed her classmates had repeatedly sexually harassed her, and who sued the School District under both Title IX and § 1983. The Court reasoned that unlike other instances in which it had found Congress intended to preclude parallel § 1983 claims, Title IX's enforcement scheme was not carefully tailored, having only one express enforcement mechanism (funding withdrawal) and an implied private right of action. *Id.* at 255–56. The Court further concluded that parallel claims would not circumvent required procedures or allow access to new remedies. *Id.* Although the *Fitzgerald* Court was considering the availability of a § 1983 claim premised on the Equal Protection Clause, it did not identify any conceptual distinction between a civil rights suit based on a statute and one based on the Constitution. Furthermore, Plaintiffs' § 1983 claim here is not brought against an individual educator, so they are not attempting to circumvent Title IX's limitation of liability to federal funding recipients. The Court therefore does not see a reason why Plaintiffs' parallel claims could not proceed. *See Does v. Se. Delco Sch. Dist.*, 272 F. Supp. 3d 656, 664–67 (E.D. Pa. 2017) (concluding that the plaintiffs' § 1983 claims were not barred by their parallel Title IX claims).

conclusion. What is more, even if the Title IX coordinator were not trained *at all*, Plaintiffs have not shown that more training would have guaranteed that Purchase Line would place an aide on the van or remove KR from the van. Nor have Plaintiffs pleaded that those actions would have necessarily prevented Bridge from removing MDB from the van and later the school. There is ample room to criticize Purchase Line's alleged response to MDB's assault. But it does not follow that better training on Title IX procedures could have averted Bridge's decision.

Additionally, Plaintiffs fail to plausibly allege a pattern of violations. The allegation that "[u]pon information and belief, Purchase Line has committed a pattern of violations which have resulted in the deprivation of other students' rights to personal security, bodily integrity, and Equal Protection," (FAC ¶ 129,) is purely conclusory. Plaintiffs have alleged no facts regarding any other students such that Purchase Line could be liable under § 1983 for a pattern of violations. In sum, there is no plausible basis in the Complaint from which to conclude that Purchase Line violated the law through a failure to train, or a custom, practice, or policy of inadequate training rising to the level of deliberate indifference to the violation of federal rights.

### b. Claim against Punxsutawney

Plaintiffs also attempt to allege a *Monell* claim against Punxsutawney. Similarly to their claim against Purchase Line, they aver a failure to train and supervise, under a "pattern of violations" theory. They allege that Punxsutawney's "failure to adequately train its employees in the proper reporting and investigative procedures of a sexual harassment or assault complaint[] resulted in [MDB] being forced to withdraw and switch school districts." (FAC ¶ 141.)

As a preliminary matter, Punxsutawney argues that it is not a "state actor" for purposes of § 1983. This inquiry differs from the Court's discussion in Section III.A.2, regarding whether Punxsutawney is a federal funding recipient under Title IX. As pleaded, Punxsutawney is a

private, non-profit school, and thus would not facially appear to be a state actor. However, that does not end the analysis of whether it acted under color of state law, because there are some circumstances in which "there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349 (1974)).

The Third Circuit has "outlined three broad tests generated by Supreme Court jurisprudence to determine whether state action exists," which are as follows:

> (1) "[W]hether the private entity has exercised powers that are traditionally the exclusive prerogative of the state"; (2) "whether the private party has acted with the help of or in concert with state officials"; and (3) whether "the [s]tate has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity."

*Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir. 1995)). In deciding whether state action has occurred, the central purpose of the inquiry is to "assure that constitutional standards are invoked when it can be said that the State is *responsible* for the specific conduct of which plaintiff complains." *Brentwood*, 531 U.S. at 295 (citation omitted).

Plaintiffs have not alleged any facts in their Complaint to support an inference that Punxsutawney is or was a state actor under any of these principles. On that basis alone, all of their § 1983 claims against Punxsutawney would be foreclosed. Their only averment on this score is the conclusory statement that "[u]pon information and belief and at all relevant times, Defendant Punxsutawney was a state actor acting under the color of state law." (FAC ¶ 112.) Nor do they add any meaningful argument on the matter in their response to Punxsutawney's Motion to Dismiss, except to contend that Punxsutawney was performing a public function and allegedly

receiving federal funding. (*See* Pls.' Response to Punxsutawney, ECF No. 30, at 9.) Under *Twombly/Iqbal*, their conclusory pleading is insufficient. Even taking as true that Punxsutawney receives federal funds, the Third Circuit has made plain that public funding alone is not enough. *See Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 164–66 (3d Cir. 2001) (concluding that private school did not perform an exclusive public function as to the students for which it received public funding).

The Supreme Court has also considered whether a private institution could be considered a state actor because it exercised powers that are traditionally the exclusive prerogative of the state in *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982). That case concerned a private, nonprofit institution that specialized in treating and educating students who had difficulty attending public high schools due to drug, alcohol, or behavioral issues. *Id.* at 840. Even though the school received "virtually all of [its] income" from government funding, the Court rejected the argument that funding alone made it a state actor. *Id.* The Court further stated that "[a]cts of . . . private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Id.* at 841. The Court also commented: "[t]hat a private entity performs a function which serves the public does not make its acts state action." *Id.* Similarly here, Plaintiffs have provided nothing more to support an inference that Punxsutawney, even if it receives federal funding, is a state actor for purposes of § 1983.

Even if Punxsutawney were a state actor, under the same legal principles outlined above, the Court concludes that Plaintiffs have failed to state a *Monell* claim. Plaintiffs aver that Punxsutawney failed to properly train and supervise its employees, and that it committed "a pattern of violations" resulting in depriving other students of their rights to bodily integrity. (FAC ¶¶ 137–38.) They also claim that Punxsutawney's "ignoring its duties under federal law,"

including Title IX, "demonstrate[s] an adopted practice, custom, or policy in deliberate indifference to [MDB]'s safety." (*Id.* ¶ 140.)

Plaintiffs have not pointed to any other incident involving MDB or any other person, where a Punxsutawney employee caused or failed to prevent harm similar to the harm alleged. The Complaint does not contain any averments that could support an inference of a pattern indicative of failure to train. One instance is generally not enough to assert a pattern of violations. *See, e.g., Cornfield by Lewis v. Consolidated High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993) (holding that, in a failure-to-train action, "two reported incidents of strip searching at Carl Sandburg [High School] . . . fall short of a pattern of violations sufficient to put the school board on notice of potential harm to students"); *Peters v. Cmty. Educ. Ctrs., Inc.*, No. 11–850, 2014 WL 981557, at *7 (E.D. Pa. Mar. 13, 2014) ("[T]wo instances of inappropriate conduct do not establish a custom under *Monell*."); *cf. Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 728–29 (3d Cir. 1989) (concluding that a jury could have viewed the concealment of five complaints of sexual assaults of students by teachers and staff as a custom of condoning "assaultive behavior"). Plaintiffs would have to assert a practice of "reckless indifference to instances of known or suspected sexual abuse," *Stoneking*, 882 F.2d at 724–25, which they have not done. In order for Plaintiffs to establish deliberate indifference, "something more culpable must be shown than a negligent failure to recognize a high risk of harm to plaintiffs." *Black by Black v. Indiana Area Sch. Dist.*, 985 F.2d 707, 712–13 (3d Cir. 1993) (quoting *Colburn v. Upper Darby*, 946 F.2d 1017, 1025 (3d Cir. 1991) (internal quotation marks omitted)).

The bare allegation that "Punxsutawney has committed a pattern of violations which have resulted in the deprivation of other students' rights," (FAC ¶ 139,) is conclusory. Plaintiffs did not include any factual allegations relating to any previous similar incidents where

23

Punxsutawney allegedly violated individuals' rights by failing to investigate a sexual assault or by failing to provide a parent's requested accommodations. Plaintiffs have instead paraphrased *Monell*'s language. But a "formulaic recitation of the elements of a cause of action will not do." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 555). Plaintiffs' conclusory allegations, without more specific factual averments, do not suffice to demonstrate deliberate indifference. Therefore, Plaintiffs have not stated a plausible claim for municipal liability under a failure-to-train theory.

### 2. State-related danger claim

"[T]he Due Process Clause does not impose an affirmative duty upon the state to protect citizens from the acts of private individuals," but the state-created danger doctrine provides an exception to this general rule. *Sanford v. Stiles*, 456 F.3d 298, 303–04 (3d Cir. 2006). The Third Circuit has held that a plaintiff asserting a claim under the state-created danger doctrine must prove the following four elements:

> (1) the harm ultimately caused was foreseeable and fairly direct;
> (2) a state actor acted with a degree of culpability that shocks the conscience;
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* at 304–05.

The Third Circuit has emphasized that "[t]he Supreme Court has counseled a restrained approach in the area of substantive due process," and that the state-created danger doctrine is a "narrow exception to the general rule that the state has no duty to protect its citizens from private harms." *Henry v. City of Erie*, 728 F.3d 275, 286 (3d Cir. 2013).

Plaintiffs have not brought their state-related danger claims against any Purchase Line or Punxsutawney officials. The Third Circuit has not squarely addressed whether, in such cases, the "policy, custom, or practice" theory under *Monell* is a separate and distinct analysis from state-created danger, or whether courts must conduct a layered analysis, by first analyzing whether an individual state actor violated a plaintiff's due process rights under the state-related danger theory and *then* determining the municipality's liability for that violation under *Monell*. The Third Circuit in *Morrow v. Balaski* considered claims against an individual defendant and a school district defendant, but because it held that the plaintiffs failed to state a claim under the underlying state-related danger exception, even assuming the school district was a proper defendant for that exception. *See* 719 F.3d 160, 179 & n.21 (3d Cir. 2013) (en banc) ("[W]e need not address whether . . . the School District may be held liable as a municipal defendant."). Similarly here, the Court concludes that Plaintiffs have failed to state an underlying state-related danger claim against either Purchase Line or Punxsutawney, and the Court therefore need not conduct a layered *Monell* analysis.

a.     Claim against Purchase Line

The Court concludes that even if Plaintiffs were able to allege facts to support the other elements of their state-created danger claims, they have not plausibly alleged that Purchase Line affirmatively acted to place MDB in danger.

"[A] state's failure to take affirmative action to protect a victim from the actions of a third party will not, in the absence of a custodial relationship . . . support a civil rights claim." *Id.* at 282 (quoting *Brown v. Grabowski*, 922 F.2d 1097, 1101 (3d Cir. 1990)). As such, "[i]t is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Id.* For a state-created danger claim to survive, Plaintiffs would have to show that Purchase Line

"*affirmatively* used [its] authority in a way that created a danger to [MDB] or that rendered [MDB] more vulnerable to danger than had the state not acted at all." *Sanford v. Stiles*, 456 F.3d at 305.

This they have not done. The Complaint contains no well-pleaded allegations that Purchase Line's policy, practice, or custom affirmatively created a danger to MDB or made him more vulnerable to danger. "[T]he governing rule is that there can be no liability in the absence of an affirmative exercise of state authority." *Bright*, 443 F.3d at 284. It is not enough for the state to exercise its authority, there must also be "a direct causal relationship between the affirmative act of the state and the plaintiff's harm," such that the action "was the 'but for cause' of the danger faced by the plaintiff." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 432 (3d Cir. 2006). Plaintiffs cloud this issue by alleging that "[i]t was not objectively reasonable for Purchase Line to place [MDB] in a dangerous situation, i.e. riding the van with his assailant." (FAC ¶ 101.) But Plaintiffs have failed to plead facts to support an inference that MDB ever rode in the van after he told his parent about the incident. Thus, Purchase Line did not place MDB in danger.

Plaintiffs' allegation that Purchase Line affirmatively created a danger "by allowing the sexual assailant to continue to ride the van and by choosing not to place an aide onto the van," (FAC ¶ 104,) does not pass muster. Again, the fact that Purchase Line did not implement Bridge's proposed accommodations does not impose liability for Bridge's own actions. *See Bright*, 443 F.3d at 282 ("It is the misuse of state authority, rather than the failure to use it, that can violate the Due Process Clause."). Here, even if Purchase Line had implemented one or all of Bridge's solutions, it does not necessarily follow that Bridge would have chosen to keep MDB at Punxsutawney.

The Third Circuit foreclosed Plaintiffs' line of reasoning in *Morrow v. Balaski*, in which

the Court held that the defendant School District's failure to expel the plaintiff-students' bully/harasser could not be affirmative conduct triggering a duty to protect from danger. 719 F.3d 160, 179. The plaintiffs had attempted to convert the School District's alleged inaction into an affirmative act creating a dangerous situation for the plaintiffs. The Court posited that "[u]nder [such] reasoning, . . . every decision by school officials to use or decline to use their authority, disciplinary or otherwise, would constitute affirmative conduct." *Id.* at 178. Accordingly, "any and all failures to act" cannot "be transformed into an affirmative exercise of authority." *Id.* Notably, the Court also considered the allegation that the defendants permitted the plaintiff-students' bully to board their bus despite knowing that it was not her correct bus. "However, the only reasonable interpretation of that allegation is that the Defendants *failed* to take any affirmative steps to ensure that [the assailant] did not board the . . . children's bus." *Id.* at 179. The Court concluded that "merely restating the Defendants' inaction as an affirmative failure to act does not alter the passive nature of the alleged conduct." *Id.*

Just so here. Plaintiffs have not set forth any facts alleging that an affirmative act created a danger to MDB. The Third Circuit has repeatedly rejected state-created danger claims involving peer harassment or violence, even when school officials allegedly knew of the dangerous conditions ultimately resulting in injury to the plaintiffs, when those officials did not affirmatively act to create the danger. *See id.*; *Brown v. Sch. Dist. of Phila.*, 456 F. App'x 88, 90 n.5 (3d Cir. 2011) (holding that school's failure to expel or punish a violent student is not an affirmative act); *D.R. by L.R. v. Middle Bucks Area Vo. Tech. Sch.*, 972 F.2d 1364, 1370 (3d Cir. 1992) (holding that school's failure to adequately remediate known physical and sexual misconduct by students is not an affirmative act). This Court cannot impose federal civil rights liability for Purchase Line's failure to implement Bridge's desired accommodations in the

27

asserted circumstances.

### b. Claim against Punxsutawney

As explained above, the Complaint's failure to plausibly plead facts demonstrating that Punxsutawney is a state actor forecloses this claim. But beyond that, Plaintiffs must plausibly allege that Punxsutawney affirmatively used its authority in a way that put MDB in danger or that made him more vulnerable to danger than if Punxsutawney had not acted. Here, Plaintiffs essentially claim that Punxsutawney failed to act or ignored its obligations under Title IX. As set forth by the Third Circuit in *Morrow v. Balaski*, and as discussed in more detail above, a failure to act does not affirmatively create a danger. Therefore, Plaintiffs have not plausibly alleged that Punxsutawney affirmatively placed MDB in danger. Thus, even if they could establish the other elements of state-created danger, they have not adequately pleaded facts to support their claim.

\*\*\*

In sum, Plaintiffs have failed to plausibly allege § 1983 claims against Purchase Line or Punxsutawney under either a state-created danger or a *Monell* theory of liability. These claims will therefore be dismissed without prejudice.

### C. **Pendent State-Law Claims**

Plaintiffs also allege Pennsylvania state law claims against Punxsutawney and Tri-County. As explained below, the Court concludes that Plaintiffs' state law claims against Punxsutawney, their negligent infliction of emotional distress claim against Tri-County, and Bridge's negligence claim against Tri-County cannot proceed, but MDB's negligence claim against Tri-County will not be dismissed.

## 1. Claims against Punxsutawney

As an initial matter, if Plaintiffs wish to proceed on a theory that Punxsutawney is a state actor, then their state-law tort claims against Punxsutawney may have to be dismissed under the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"), which provides tort immunity for local agencies, including schools. As noted above, this is a factual matter not resolvable on a Motion to Dismiss, and so the Court will assume for the purposes of Plaintiffs' state tort claims against Punxsutawney that it is not a "local agency" under the PSTCA.

The Court concludes that Plaintiffs' tort claims against Punxsutawney are barred by the gist of the action doctrine, and their breach of contract claim fails on its own terms.

### a. Breach of Contract against Punxsutawney

Plaintiffs allege that Punxsutawney breached the enrollment contract and its alleged provision that Punxsutawney would "work to meet the mental, physical, and spiritual needs of every student," (FAC ¶ 168) and the provision that it would follow disciplinary policies, (FAC ¶ 170). Punxsutawney argues this claim should be dismissed it relies upon conclusory and insufficient allegations.

In Pennsylvania, to recover for a breach of contract, a plaintiff must show "(1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resultant damages." *CoreStates Bank v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999). Plaintiffs and Punxsutawney agree that the 2015–2016 Student Handbook, which Punxsutawney attached to its Motion to Dismiss, is the contract at issue. (*See* Punxsutawney Christian School Student Handbook ("Student Handbook"), ECF No. 18–2.)[10]

The Student Handbook provides, in its 'Student Acceptance and Admission Policy" that:

---

[10] When a plaintiff bases her cause of action on a written agreement, the defendant may attach the agreement and it may be referred to for purposes of deciding a motion to dismiss or demurrer. *Line Lexington Lumber & Millwork Co. v. Pa. Publishing Corp.*, 301 A.2d 684 (Pa. 1984).

> It is our belief that it is a school's responsibility to properly educate a child in all areas of development. Our goal is to work with the parents to meet the mental, physical, and spiritual needs of every student. Unfortunately, at this time, PCS is unable to meet the needs of most students eligible for special education services.

(Student Handbook, at 9.) The Handbook goes on to describe the kinds of special education support that Punxsutawney is not equipped to provide, and advises that "[i]f we cannot effectively meet the needs of these students at this time, we are unable to accept their admittance." (*Id.*) Read in context, this Handbook provision addresses Punxsutawney's inability to provide appropriate education for students who qualify for special education services. It does not impose a contractual duty on Punxsutawney to provide certain (or any) responses to a claim of sexual assault that occurred off school grounds and while the victim and assailant were being transported by a third party under another third party's state-law obligations. Nor has Plaintiff pleaded with specificity what duty this provision imposed or how it was breached.

As to the disciplinary policies, the Student Handbook grants Punxsutawney discretion in determining what action, if any, is appropriate following an alleged violation. Even for the most severe offenses, which include bullying, fighting, cheating, possession of a weapon, and possession or use of alcohol, drugs, or tobacco, the Student Handbook provides that "[a]ny student engaging in severe offenses will be referred to the administrator, who will then take the action that he or she sees fit within the procedures and policies of [Punxsutawney]." (Student Handbook, at 34.) Plaintiffs' averment that Punxsutawney breached this provision by failing to discipline KR is insufficient to make out a breach of contract, because the Student Handbook did not impose a duty on Punxsutawney to enforce any specific sort of discipline on KR.

Finally, Plaintiffs have failed to plead facts that would show that they suffered recoverable damages. Under Pennsylvania law, mental suffering is not a proper element of breach-of-contract damages. *See Carpel v. Saget Studios, Inc.*, 326 F. Supp. 1331, 1334 (E.D. Pa.

1971). Pennsylvania has adopted section 341 of the Restatement of Contracts, which provides that such damages are only recoverable where the "breach is wanton or reckless and caused bodily harm and where the contract is to render a performance of such a character that the defendant had reason to know when the contract was made that the breach would cause mental suffering for reasons other than mere pecuniary loss." *Emerman v. Baldwin*, 142 A.2d 440, 447 (Pa. 1958).

Plaintiffs have not averred facts which would show a wanton or reckless breach of contract, or where the contract required Punxsutawney to perform in a way that it would have reason to know that such a breach would cause mental suffering. Plaintiffs have not pleaded wanton or reckless conduct on Punxsutawney's part. That administrators declined to discipline KR for an event that occurred while KR was not under their authority is not wanton or reckless. The Student Handbook did not obligate them to provide any specific discipline, and a reasonable jury could not conclude from the facts alleged that Punxsutawney wantonly or recklessly exercised its discretion.

### b. Negligence against Punxsutawney

The "gist of the action" doctrine prevents plaintiffs from recasting ordinary breach of contract claims as tort claims. *See Hart v. Arnold*, 884 A.2d 316, 339 (Pa. Super. 2005). "[T]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." *Redevelopment Auth. v. Int'l Ins. Co.*, 685 A.2d 581, 590 (Pa. Super. 1996). The gist of the action is contractual if "the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts." *Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 104 (3d Cir. 2001) (quoting *Bash v. Bell*

31

*Telephone Co.*, 601 A.2d 825, 830 (1992)). The nature of the allegedly breached duty is the decisive factor—if the duty would not exist without the contract, then the claim sounds in contract alone. *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014).

The relationship between the state and a student may give rise to a special duty of care. *See Nicini v. Morra*, 212 F.3d 798, 806–09 (3d Cir. 2000); *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1371–72 (3d Cir. 1992). But under Pennsylvania law, the relationship between a student and a *private* school is a contractual one. *See David v. Neumann Univ.*, 177 F. Supp. 3d 920, 925 (E.D. Pa. 2016) (citing *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. 1999)); *see also Kimberg v. Univ. of Scranton*, 411 Fed. App'x 473, 479 (3d Cir. 2010) (quoting *Swartley*, 734 A.2d at 919).

Plaintiffs have not cited to any cases suggesting that a private school owes its students any special duty above and beyond the contract. However, the Court has identified caselaw recognizing that a private school may owe other legal duties, defined by tort law, to their students. *See, e.g.*, *Dobson v. Milton Hershey Sch.*, 356 F. Supp. 3d 428, 437 (M.D. Pa. 2018); *Feleccia v. Lackawanna Coll.*, 156 A.2d 1200, 1216 (Pa. Super. 2017). In these cases, the plaintiffs alleged circumstances from which a special duty arose between the school and the plaintiffs. For instance, in *Feleccia*, the Pennsylvania Superior Court concluded that Lackawanna College owed a duty to student athletes engaging in school-sponsored and -supervised intercollegiate athletic activity that required it to have qualified medical personnel present and to provide adequate treatment in case of an emergency. 156 A.2d at 1215. And in *Dobson*, the Middle District of Pennsylvania concluded that the plaintiff's claims were not barred by the gist of the action doctrine when he alleged that the Milton Hershey School, at which he was a private resident student housed in a group home and supervised by school "houseparents," "exercised

year-round custody, care, and control over him and functioned as primary caregiver—providing education, housing, food, clothing, and medical, dental, and psychological care." 356 F. Supp. 3d at 432, 437.

By contrast, Plaintiffs have not sufficiently alleged any social obligation or duty existing outside the contract with Punxsutawney that the school allegedly violated. They allege that Punxsutawney owed MDB a duty to "care for his emotional well-being," and "ensure his safety," (FAC ¶¶ 155–56,) but their alleged injuries arise from Punxsutawney's alleged failure to discipline KR. This averment sounds in contract, not tort, because it alleges that Punxsutawney did not follow its own disciplinary policies, as discussed above. It does not extend from any larger social duty than the contract between Bridge and Punxsutawney. To the extent that Plaintiffs also plead that Punxsutawney negligently failed to place an aid on the van, they have not adequately alleged that supervising students on the van was Punxsutawney's (and not Purchase Line's) responsibility under state law requiring Purchase Line to provide transportation to private school students.

### c. Negligent Infliction of Emotional Distress against Punxsutawney

Plaintiffs also allege negligent infliction of emotional distress ("NIED") against Punxsutawney. As to Bridge, Plaintiffs have not alleged that Punxsutawney owed any duty to Bridge, or that Bridge suffered emotional distress as a result of being a close relative or in the zone of danger to MDB's injury, (*see* FAC ¶¶ 144–51,) so the NIED claims brought by Bridge will be dismissed.

As to MDB, Plaintiffs claim that Punxsutawney caused MDB physical and psychological trauma and distress "[b]y allowing [him] to be placed in continued way of harm and a hostile

environment by requiring him to leave his educational program, in order to be safe." (FAC ¶ 150.) As discussed above, the gist of the action doctrine also bars this tort claim.

Even if the gist of the action doctrine did not preclude the NIED claim, Defendants argue that this claim must be dismissed because Plaintiffs have not plausibly alleged facts that would accord with one of the four factual scenarios that Pennsylvania has recognized may state a NIED claim. Pennsylvania addresses NIED claims in terms of foreseeability. *Turner v. Med. Ctr.*, 686 A.2d 830, 832 (Pa. Super. 1996). The determination of liability depends on "whether the emotional injuries sustained by the plaintiff were reasonably foreseeable to the defendant." *Sinn v. Burd*, 404 A.2d 672, 684 (Pa. 1979). Pennsylvania has recognized only four factual scenarios that can sustain an NIED claim: (1) the defendant had a contractual or fiduciary duty towards the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative. *Toney v. Chester Cty. Hosp*, 961 A.2d 192, 195 (Pa. Super. 2008), *aff'd*, 36 A.3d 83 (Pa. 2011).

Plaintiff argues, citing the Pennsylvania Supreme Court's decision in *Toney*, that an NIED claim can be supported in cases when "the defendant assumes a duty by contract, or otherwise when the duty encompasses the plaintiff's emotional well-being." *Toney*, 36 A.2d at 92. However, Plaintiffs omit that the Supreme Court was evenly divided, that the Opinion was in support of affirmance, and not the Opinion of the Court, and that the Opinion was quoting a treatise (*Dobbs on Torts*) rather than stating a holding of Pennsylvania law. Because the Pennsylvania Supreme Court in *Toney* was evenly divided, Justice Baer's Opinion in support of affirmance lacks precedential value. *See, e.g.*, *Shirey v. Giroux*, No. 11–1693, 2014 WL 5825309, at *3 n. 7 (M.D. Pa. Nov. 10, 2014) ("[A]n opinion of an evenly divided Pennsylvania

Supreme Court has no precedential value."); *Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 217 n. 16 (Pa. Super. 2012) ("Since the [Supreme] Court was divided evenly, this opinion does not have precedential value, although it has persuasive value."). The Court will consider the Opinion in *Toney* persuasive, but not binding, as to how the Pennsylvania Supreme Court would even recognize an NIED claim based on the breach of a contractual or fiduciary duty.

In *Toney*, the defendants were obstetricians who informed the plaintiff that her ultrasound results were normal. *Toney*, 36 A.2d at 85. The plaintiff went on to deliver a child who had "several profound physical deformities." *Id.* She alleged that this delivery caused her emotional distress, and sued the doctors under an NIED theory because they had allegedly failed to properly read the ultrasound. *Id.* The Supreme Court was evenly divided on the issue of whether a cause of action for NIED was even available for a case involving a negligent breach of a contractual or fiduciary duty, absent a physical impact or injury. *Id.* at 84. Those Justices who favored the availability of such claims wrote that they "find it prudent to limit the reach of this NIED claim to preexisting relationships involving duties that obviously and objectively hold the potential of deep emotional harm in the event of breach" and that these "special relationships must encompass an implied duty to care for the plaintiff's emotional well-being." *Toney*, 36 A.3d at 95 (Baer, J.). They further noted that not even all doctor-patient relationships would qualify, but because the relationship in *Toney* existed between prenatal obstetricians and an expectant mother, the doctors had a duty to care for their patient's emotional well-being when diagnosing fetal abnormalities. *Id.*

Here, it appears Plaintiffs are attempting to pursue this claim under the first scenario—that Punxsutawney had an alleged contractual or fiduciary relationship with MDB and Bridge. Since *Toney*, Pennsylvania courts have only found certain doctor/patient relationships (such as

35

the one at issue in *Toney*), and one between an adoption agency and adoptive parents to support such a claim, declining to extend liability any further. *See Walsh v. Univ. of Pitt.*, No. 13–00189, 2015 WL 128104, at *15 (W.D. Pa. Jan. 8, 2015); *Hershman v. Muhlenberg Coll.*, 17 F. Supp. 3d 454, 460 n.8 (E.D. Pa. 2014) (collecting cases and explaining that Pennsylvania courts have not found a special relationship in cases involving, *inter alia*, employer-employee, lender-borrower, casino-patron, airline-passenger, or contractor-building-owner relationships). Here, Plaintiffs argue that because Punxsutawney assumed the responsibility and care for MDB during the school day, it is a special relationship where Punxsutawney understood it was in charge of MDB's emotional well-being.

Based on the caselaw, the Court concludes that, absent special circumstances not present here, the Pennsylvania courts would not extend liability for the NIED tort to a case involving a relationship between a school and its student. Justice Baer's Opinion outlined the discussion of other state high courts to have considered whether to extend availability of NIED to special relationships, all of which dealt with "intensely emotional noncommercial subjects such as preparing a corpse for burial," *id.* at 92 (quoting *Freeman v. Harris Cty.*, 183 S.W.3d 885, 890 (Tex. Ct. App. 2006). The Opinion also drew on Professor Dan B. Dobbs's *The Law of Torts*, in which Professor Dobbs suggested that a special relationship could involve psychologists, mortuaries, and other relationships where the defendant knows its assumed duty includes a duty to care for the emotional well-being of the plaintiff. *Id.* at 92 (citing *The Law of Torts*, § 312 (2000)).

In *The Law of Torts*, Professor Dobbs explained that caring for the emotional well-being of the plaintiff is a "duty to take care for the feelings of," e.g., the mother of a stillborn child. *Id.* § 29.15. Plaintiffs have not established that, as a matter of law, a similar duty exists between a

36

private school and a student. They have identified no cases in which a court held that a school was responsible for the care of the feelings of a child. Nor does the Court see a logical connection between the duty Plaintiffs claim Punxsutawney owed MDB and that owed by a hospital to, e.g., not mix up two babies at birth. *See id.* The relationship between Punxsutawney and MDB was simply not of the intensely emotionally charged sort where courts have recognized a "special relationship" giving rise to a duty not to negligently inflict emotional distress.

Even if there were a duty arising from a special relationship, however, Plaintiffs' claim would still fail because they have failed to allege facts presenting a reasonable inference that MDB experienced compensable emotional harm. Compensable emotional harm is not the type of harm that "a reasonable person is expected to bear." *Toney*, 36 A.3d at 95. Rather, such emotional distress must be the "visceral and devastating assault on the self . . . resembl[ing] physical agony in its brutality." *Id.* (citing Gregory C. Keating, *Is Negligent Infliction of Emotional Distress a Freestanding Tort?* 44 Wake Forest L. Rev. 1131, 1174 (2009)).

The psychological distress Plaintiffs allege here is not the type of visceral or agonizing pain which *Toney* suggested would be compensable. The Court does not doubt that "withdraw[ing] from school, leaving his friends, and enter[ing] a new school" was distressing for MDB. (*See* Pl.'s Reply to Punxsutawney, ECF No. 30, at 13.) However, this is the kind of harm that reasonable people are expected to bear. *Cf. Madison v. Bethanna, Inc.*, No. 12–01330, 2012 WL 1867459 (E.D. Pa. May 23, 2012) (permitting adoptee parents' lawsuit against adoption agency for NIED to proceed, when the parents' adopted son raped their two-year-old daughter and the agency had affirmatively misrepresented the adopted son's history of sexual abuse when the parents repeatedly asked about it out of concern for their young daughter).

## 2. Claims against Tri-County

Plaintiffs also bring tort claims against Tri-County. The Court concludes that Tri-County has failed to demonstrate that MDB's negligence claim should be dismissed, but that Plaintiffs' NIED claim and Bridge's negligence claim cannot proceed.

### a. Negligence claim against Tri-County

Plaintiffs allege that by allowing KR to continue to ride the van after having knowledge of the sexual assault, Tri-County appreciated the risk of safety to MDB and acted in conscious disregard of it. Tri-County argues that Plaintiffs have not alleged facts to support a reasonable inference that Tri-County breached a duty of care or that that breach caused the alleged injuries, i.e., MDB having to choose between attending Punxsutawney and another private school.

As an initial matter, Plaintiffs do not allege with specificity that Tri-County owed *Bridge* a duty of care. As such, Bridge's negligence claim will be dismissed.

However, MDB's claim stands on a different footing. Plaintiffs allege that Tri-County told Bridge that "it does what Purchase Line tells it to do and had no ability to take any independent action." (FAC ¶ 35.) It is not clear from the Complaint whether this refers to Tri-County's authority to remove KR from the van, or its authority to take some other action. Plaintiffs' allegations regarding Tri-County's supervision *before* the assault are insufficient to support their claim that MDB was injured by choosing between Punxsutawney and another private school after the assault. Nevertheless, as pleaded, Plaintiffs have averred that Tri-County did nothing to ensure that after the assault, MDB could safely access his transportation to and from school. Tri-County has not met its burden to show that this averment is insufficient to survive dismissal, having only argued in conclusory fashion that the pleaded facts do not make out a breach of duty or causation. As such, this claim may proceed to discovery.

38

### b. Negligent infliction of emotional distress claim against Tri-County

Under the same legal principles outlined above with respect to Plaintiffs' NIED claim against Punxsutawney, their NIED claim against Tri-County also cannot survive. As discussed, Pennsylvania courts have only recognized NIED claims based on special relationships to proceed in limited circumstances, in which the relationship encompassed an implied duty to the plaintiff to care for the plaintiff's emotional well-being. *See Hershman*, 17 F. Supp. 3d at 460 & n.8.

Here, Plaintiffs have not alleged facts to support an inference that Tri-County owed MDB a duty to care for his emotional well-being. The facts do not fall within the limited circumstances contemplated by the affirming Justices in *Toney* or subsequent Pennsylvania courts, and do not support an extension of liability in this case. Nor, as noted above, have Plaintiffs alleged that Tri-County owed *Bridge* a duty based on a special relationship.

## IV.    CONCLUSION

Defendants' respective Motions to Dismiss will be granted in part and denied in part. Plaintiffs' claims at Counts II–VIII and X will be dismissed. Bridge's claim against Tri-County at Count IX will also be dismissed. The claims that remain are Plaintiffs' claim against Purchase Line in Count I, and MDB's claim against Tri-County at Count IX.

An appropriate Order will follow.

Mark R. Hornak
Chief United States District Judge

Dated: May 3, 2019